**TAX COURT OF NEW JERSEY**

JOSHUA D. NOVIN
Judge



Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

April 21, 2025

Daniel J. Pollak, Esq.
Brach Eichler, LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue, Suite 310 N
Lyndhurst, New Jersey 07071

      Re:    <u>West Broadway Realty, LLC v. Paterson City</u>
             Docket Nos. 006902-2020, 002698-2021, 000288-2022, 000075-2023,
             and 000486-2024

Dear Mr. Pollak and Mr. Turner:

This letter constitutes the court's opinion following trial of plaintiff, West Broadway Realty, LLC's ("plaintiff") challenge to the 2020, 2021, 2022, 2023, and 2024 tax year assessments on plaintiff's improved property in Paterson City ("Paterson").

For the reasons stated herein, the court enters judgments dismissing plaintiff's 2020 and 2021 tax year complaints, and enters judgments reducing plaintiff's 2022, 2023, and 2024 tax year assessments.

## I.    <u>Procedural History and Factual Findings</u>

Pursuant to <u>R.</u> 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered during trial.

Plaintiff is the owner of the real property and improvements located at 466-490






Chamberlain Avenue, Paterson, Passaic County, New Jersey. The property is identified on Paterson's municipal tax map as block 1006, lots 3 and 4 (the "subject property").

As of each valuation date at issue, the subject property was improved with a one-story neighborhood shopping center, in average condition, constructed between 1965 and 1970.[1] The shopping center comprises approximately 24,502 square feet of gross leasable area and contains approximately 130 parking spaces.[2] The subject property is in Paterson's B-2, Community Business zoning district, with permitted uses that include business or professional offices, banks and drive-through banks, neighborhood retail businesses, personal service businesses, and community retail businesses. Thus, plaintiff's operation of the subject property as a neighborhood shopping center is a legally conforming use.

The subject property is located on Chamberlain Avenue at the intersection of West Broadway, along the Paterson and Haledon Borough border. It contains approximately 470 feet of frontage along Chamberlain Avenue, and 222 feet of frontage on along West Broadway.

---

[1] In general, a neighborhood shopping center is characterized as having approximately 30,000 to 100,000 square feet and serves the immediate surrounding neighborhood with a population of 3,000 to 40,000 people. Appraisal Institute, The Appraisal of Real Estate, 153 (15th ed. 2020).

[2] During trial, plaintiff's expert testified that the shopping center comprises 24,420 square feet of gross leasable area. In contrast, Paterson's expert testified that the shopping center comprises 24,782 square feet of gross leasable area. Yet, for unexplained reasons, in its post-trial brief Paterson stated that it "does not contest that the subject property was a 24,420 square foot retail neighborhood shopping center." Both experts agreed that the current end-cap Dunkin' Donuts retail space consists of 2,000 square feet and the Valley National Bank retail space consists of 3,000 square feet. Plaintiff's expert and plaintiff's rent rolls identify the retail space with ISD Renal, Inc. as occupying 9,120 square feet. Plaintiff's expert identifies the retail space with Family Dollars Stores of New Jersey as occupying 10,300 square feet. However, Paterson's expert's report states that the retail space with Family Dollar Stores of New Jersey, LLC occupies 10,382 square feet. Moreover, Paterson's expert's reproduced rent roll for the subject property evinces an initial annual rent of $127,698.60 at a $12.30 per square foot rental rate, which equates to 10,382 square feet of leased area ($127,698.60 / $12.30 = 10,382). Thus, the court finds that the subject property comprises 24,502 square feet of leasable area (2,000 + 3,000 + 10,382 + 9,120).






Collectively, the subject property's lots are trapezoidal-shaped and consist of approximately 2.473 acres. The topography of the lots is level with Chamberlain Avenue and West Broadway.

The site is serviced by public utilities, including municipal sewer and water. The subject property is principally located in Special Flood Hazard Area Zone X, denoting an area of minimal flooding risk. However, the rear portion of the property is adjacent to the Molly Ann Brook and thus, is in Special Flood Hazard Zone AE.

Plaintiff timely filed complaints challenging the subject property's 2020, 2021, 2022, 2023, and 2024 tax year assessments. During trial, plaintiff and Paterson each offered testimony from a New Jersey certified general real estate appraiser, who were accepted by the court, as experts in the real property valuation field (the "expert" or "experts"). The experts prepared appraisal reports expressing their opinions of the subject property's true market value as of the October 1, 2019, October 1, 2020, October 1, 2021, October 1, 2022, and October 1, 2023 valuation dates.

As of each valuation date the subject property's total tax assessments, Paterson's average ratio of assessed to true value, the subject property's implied equalized value, and the experts' value conclusions are set forth below:

| Valuation date | Total tax assessments (lots 3 & 4) | Director's average ratio of assessed to true value | Implied equalized value | Plaintiff's expert's opinion of value | Paterson's expert's opinion of value |
|---|---|---|---|---|---|
| 10/1/2019 | $5,217,000 | 83.83% | $6,223,309 | $4,155,000 | $8,054,300 |
| 10/1/2020 | $5,217,000 | 76.25% | $6,841,967 | $4,155,000 | $10,311,200 |
| 10/1/2021 | $5,217,000 | 67.98% | $7,674,316 | $4,775,000 | $9,460,800 |
| 10/1/2022 | $5,217,000 | 59.35% | $8,790,227 | $4,775,000 | $9,019,000 |
| 10/1/2023 | $5,217,000 | 51.20% | $10,189,453 | $4,775,000 | $8,346,100[3] |

---

[3] For the 2024 tax year, Paterson's expert's concluded value of $8,346,100 would warrant a reduction in the subject property's tax assessment to $4,273,203.


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



In 2020, the plaintiff undertook significant renovations to the subject property, including reconfiguring certain retail spaces in the shopping center. According to plaintiff's expert, the plaintiff spent approximately $307,549 to renovate and reconfigure the property. The renovations were needed to update vacant units, upgrade the exterior façade, and to transform the subject property for new prospective tenants following Rite Aid's/Walgreens termination of its former lease for the subject property in 2018. The photographs offered into evidence and included in the experts' appraisal reports confirm such renovations and reconfiguration.

Importantly, the renovations resulted in the execution of three new retail leases for the shopping center. The first lease was entered into in or about July 2020 between plaintiff and ISD Renal, Inc. c/o DaVita Inc. ("DaVita"), for approximately 9,120 square feet of retail space. The lease term is for twelve (12) years, with a reported effective rent of $19.92 per square foot.[4] The second lease was entered into in or about August 2020, with a June 2021 lease commencement date, between plaintiff and Babson Partners Chamberlain Ave DT, LLC ("Babson"), operating as a Dunkin' Donuts franchisee.[5] Babson agreed to vacate its existing 1,615 square foot fast-food retail space in the shopping center and executed a new lease with plaintiff for a 2,000 square foot end-cap fast-food retail space with a drive-thru.[6] The lease term is for twenty (20) years, with a

---

[4] Plaintiff's expert reported an effective rent of $19.92 per square foot. In contrast, Paterson's expert reported an effective rent of $21.37 per square foot. The $1.45 per square foot discrepancy arises from the leasable area that each expert attributed to the retail space. Plaintiff's expert attributed 9,120 square feet and Paterson's expert attributed 8,500 square feet. Based on the court's review of the plaintiff's rent rolls, the court finds that the 9,120 square foot measurement is more accurate and thus, the $19.92 per square foot effective rent is correct.

[5] Paterson's expert's report identified the lease as being executed in August 2020. Plaintiff's expert's Addenda identified the lease as having a June 2021 commencement date.

[6] In general, end-cap refers to the retail areas located at either end of a shopping center, featuring better visibility. Although not all end-cap retail areas feature a drive-thru, they are premium retail locations for certain business types and uses.






reported effective rent of $52.01 per square foot. The third lease was entered into in or about March 2021 between plaintiff and Family Dollar Stores of New Jersey, LLC ("Family Dollar Stores"), for 10,382 square feet of retail space. The lease term is for seven (7) years, with a reported effective rent of $12.30 per square foot.

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence






of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessments has overcome the presumption of validity. If the court concludes that the challenging party has not carried its burden, then dismissal of the action is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording plaintiff all reasonable inferences that could be deduced from the evidence presented, the court finds that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. The plaintiff's expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's tax assessments.

### B. Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically






possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, both experts concluded, and the court agrees, that the highest and best use of the subject property, as vacant, and as improved, is as a retail shopping center.

### C. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

### 1. Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and









mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). See Parkway Village Apartments Co., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Here, it is undisputed that the subject property is income-producing. Moreover, both experts employed the income capitalization approach, relying on evidence derived from the subject property and the marketplace to estimate its true or market value. The court finds the experts' adopted methodology credible. Therefore, the court finds the income capitalization approach is the most appropriate method for determining the subject property's true or market value.

### A. Market or Economic Rent

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270. Market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The market rent allows an appraiser to accurately forecast the stream of income to be generated by a property and to convert that future benefit into a present value.

The economic or market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent






is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

Although both experts employed the income capitalization approach, they achieved strikingly different market values for the subject property based on how they characterized the rental units, and the economic or market rents that they ascribed to them.

### 1.    Plaintiff's expert

For the 2020 and 2021 tax years, plaintiff's expert characterized the subject property as comprising 2,465 square feet of in-line retail, 18,955 square feet of mid-size retail, and 3,000 square feet of bank retail. For the 2020 and 2021 tax years, plaintiff's expert attributed a market or economic rent of: (i) $19.00 per square foot to the in-line retail areas; (ii) $16.00 per square foot to the mid-size retail areas; and (iii) $30.00 per square foot to the bank retail.

For the 2022, 2023, and 2024 tax years, plaintiff's expert characterized the subject property as comprising 19,420 square feet of mid-size retail, 2,000 square feet of fast-food restaurant/coffee shop with drive-thru retail, and 3,000 square feet of bank retail.  For the 2022, 2023, and 2024 tax years, plaintiff's expert attributed a market or economic rent of: (i) $16.00 per square foot to the mid-size retail areas; (ii) $30.00 per square foot to the bank retail; and (iii) $35.00 per square foot to the fast-food restaurant/coffee shop with a drive-thru retail.

### a.    In-line

Plaintiff's expert identified five comparable in-line leases, all of which were in Paterson. The comparable leases comprised leased areas of 928 to 5,200 square feet and bore lease commencement dates between February 2019 and December 2023.  The unadjusted effective rents






ranged from $15.96 to $23.21 per square foot. Plaintiff's expert relied on all five comparable leases to discern his economic or market rent for the subject property's in-line retail areas for the 2020 and 2021 tax years.

Plaintiff's expert applied a downward 5% adjustment to in-line comparable leases 1, 3, 4, and 5 to account for the perceived higher condition/quality of their buildings. No other adjustments were applied. After applying the adjustments, the range of adjusted rents was $15.16 to $22.05 per square foot. Plaintiff's expert concluded an economic or market rent of $19.00 per square foot for the subject property's in-line retail space and applied it to what he characterized was 2,465 square feet of in-line retail space for the 2020 and 2021 tax years.

b. Mid-size

Plaintiff's expert identified the subject property's leases with DaVita and Family Dollar Stores and three other mid-size comparable leases, all of which were in Paterson. The mid-size comparable leases comprised areas of 9,120 to 15,984 square feet and bore commencement dates between July 2020 and June 2022. The unadjusted rents ranged from $12.40 to $21.12 per square foot. Plaintiff's expert relied on all five comparable leases to discern his economic or market rent for the subject property's mid-size retail areas for 2020, 2021, 2022, 2023, and 2024 tax years.

Plaintiff's expert applied a downward 5% adjustment to mid-size comparable leases 1 and 3 to account for the perceived higher condition/quality of their buildings. No other adjustments were applied. After applying the adjustments, the range of the adjusted rents was $15.50 to $20.06 per square foot. Plaintiff's expert concluded an economic or market rent of $16.00 per square foot for the subject property's mid-size retail space and applied it to what he characterized was the subject property's 18,955 square feet of mid-size retail area, as of the 2020 and 2021 tax years, and 19,420 square feet of mid-size retail area, as of the 2022, 2023, and 2024 tax years.






c.    Bank

Plaintiff's expert identified the subject property's 2015 option renewal bank lease with Valley National Bank, and four other comparable retail bank leases. The four other comparable bank leases were in Rockaway (Morris County), Clifton (Passaic County), Edison (Middlesex County), and Westwood (Bergen County). The comparable retail bank leases comprised leased areas of 2,227 to 3,750 square feet and bore lease commencement dates between June 2015 and December 2019. The unadjusted rents ranged from $31.78 to $36.79 per square foot. Plaintiff's expert relied on all five comparable retail bank leases to discern his economic or market rent for the subject property's retail bank area for the 2020, 2021, 2022, 2023, and 2024 tax years.

Plaintiff's expert applied a downward 10% adjustment to comparable retail bank leases 1, 2, 3, and 4, to account for their perceived superior location. No other adjustments were applied. After applying the adjustments, the range of the adjusted rents was $28.60 to $34.12 per square foot. Plaintiff's expert concluded an economic or market rent of $30.00 per square foot for the subject property's retail bank space. Plaintiff's expert applied the $30.00 per square foot economic rent to the subject property's 3,000 square feet of retail bank space for the 2020, 2021, 2022, 2023, and 2024 tax years.

d.    Fast-food restaurant/coffee shop with a drive-thru

Plaintiff's expert identified the subject property's end-cap fast-food restaurant/coffee shop with a drive-thru lease with Babson and three other comparable fast-food restaurant/coffee shop with a drive-thru leases. The three other comparable fast-food restaurant/coffee shop with a drive-thru leases were in Newton (Sussex County), Perth Amboy (Middlesex County), and West Long Branch (Monmouth County). The comparable fast-food restaurant/coffee shop with a drive-thru leases comprised leased areas of 2,000 to 2,504 square feet and bore lease commencement dates

   

between January 2019 and November 2022. The unadjusted rents ranged from $30.29 to $44.78 per square foot.[7] Plaintiff's expert relied on all four comparable leases to discern his economic or market rent for the subject property's fast-food restaurant/coffee shop with a drive-thru location for the 2022, 2023, and 2024 tax years.

Plaintiff's expert applied a downward 5% adjustment to comparable fast-food restaurant/coffee shop with a drive-thru leases 1 and 4, to account for their perceived superior condition. No other adjustments were applied. After applying the adjustments, the range of the adjusted rents was $28.78 to $44.78 per square foot. Plaintiff's expert concluded an economic or market rent of $35.00 per square foot for the subject property's end-cap fast-food restaurant/coffee shop with a drive-thru retail space. Plaintiff's expert applied the $35.00 per square foot economic rent to the subject property's 2,000 square feet of end-cap fast-food restaurant/coffee shop with a drive-thru retail space for the 2022, 2023, and 2024 tax years.

e.    Signage

As of the October 1, 2019, October 1, 2020, October 1, 2021, and October 1, 2022 valuation dates, a Wells Fargo bank was located on property adjoining the subject property. Wells Fargo paid plaintiff $3,960 annually, for use of a freestanding sign on the subject property's southwest corner.[8] However, as of March 2023, Wells Fargo vacated the adjoining property and terminated its use of the sign. The subject property's existing retail bank tenant, Valley National Bank, then began using the sign without paying any additional rent.

---

[7] Although the term of the subject property's lease with Babson was 240 months, plaintiff's expert took the average rent only for the first 120 months. In his opinion, the first 120 months of the lease with Babson renders it "most relevant and consistent with the comparable data."

[8] Plaintiff's expert's appraisal report mistakenly included the $3,960 in income attributable to the signage on his reconstructed operating statement for the 2024 tax year.






2.    Paterson's expert

For the 2020 tax year, Paterson's expert characterized the subject property as possessing 15,296 square feet of large retail area, 850 square feet of small retail area, 1,615 square feet of fast-food/restaurant retail area, and 3,000 square feet of retail bank area (totaling 20,761 square feet).  For the 2021 tax year, Paterson's expert characterized the subject property as possessing 18,832 square feet of large retail area, 850 square feet of small retail area, 2,000 square feet of fast-food/restaurant retail area, and 3,000 square feet of retail bank area (totaling 24,682 square feet).  For the 2022 and 2023 tax years, Paterson's expert characterized the subject property as possessing 18,882 square feet of large retail area, 2,000 square feet of fast-food/restaurant retail area, and 3,000 square feet of retail bank area (totaling 23,882 square feet).  For the 2024 tax year, Paterson's expert characterized the subject property as possessing 19,502 square feet of large retail area, 2,000 square feet of fast-food/restaurant retail area, and 3,000 square feet of retail bank area (totaling 24,502 square feet).

For the 2020 and 2021 tax years, Paterson's expert attributed a market or economic rent of: (i) $29.00 per square foot to the small retail area; (ii) $23.00 per square foot to the large retail area; (iii) $45.00 per square foot to the retail bank area; and (iv) $45.00 per square foot to the fast-food/restaurant retail area.  For the 2022, 2023, and 2024 tax years, Paterson's expert attributed a market or economic rent of: (i) $23.00 per square foot to the large retail area; (ii) $45.00 per square foot to the retail bank area; and (iii) $45.00 per square foot to the fast-food/restaurant retail area.

a.    Small retail and fast-food restaurant

Paterson's expert comingled his small retail and fast-food/restaurant comparable lease analysis.  Paterson's expert identified five small retail leases in his appraisal report as comparable






leases 1, 2, 3, 7, and 8.[9] The five small retail comparable leases were in Paterson. The comparable small retail leases comprised leased areas of 1,000 to 2,500 square feet and bore lease commencement dates between December 2015 and July 2021. The unadjusted rents ranged from $22.00 to $30.30 per square foot.

Paterson's expert applied a downward 20% adjustment to comparable small retail lease 7 to account for differences in expense type because it was a modified gross lease. No other adjustments were applied to the comparable small retail leases. After applying the adjustments, the range of adjusted rents for the small retail leases were $22.00 to $29.35 per square foot.[10] Paterson's expert concluded an economic or market rent of $29.00 per square foot for the subject property's small retail space. Paterson's expert applied the $29.00 per square foot economic rent to the subject property's 850 square feet of small retail space for the 2020 and 2021 tax years.

Paterson's expert's four fast-food/restaurant leases were identified in his appraisal report as comparable leases 4, 5, 6, and 9. In contrast to the small retail leases, the four fast-food/restaurant comparable leases were in several different municipalities including, Paterson, Union City (Hudson County), Fairfield (Essex County), and North Bergen (Hudson County). The comparable fast-food/restaurant leases comprised leased areas of 1,600 to 3,686 square feet and bore commencement dates between February 2016 and May 2022. The unadjusted rents ranged from $33.85 to $58.05 per square foot.

Paterson's expert applied a downward 10% adjustment to comparable fast-food/restaurant lease 4 to account for differences in expense type because it was a modified net lease. Paterson's

---

[9] As discussed later herein, unbeknownst to Paterson's expert's, one of the comparable small retail leases was a fast-food/restaurant lease.

[10] Paterson's expert's appraisal report mistakenly identified the adjusted rent for small retail lease comparable 1 as $30.95 per square foot, when it should have been $29.35 per square foot.






expert applied a 5% downward adjustment to comparable fast-food/restaurant lease 5 to account for its perceived superior location. No other adjustments were applied to the comparable fast-food/restaurant leases. After applying the adjustments, the range of the adjusted rents for the fast-food/restaurant leases was $33.85 to $52.25 per square foot. Paterson's expert concluded an economic or market rent of $45.00 per square foot for the subject property's fast-food/restaurant area. Paterson's expert applied the $45.00 per square foot economic rent to the subject property's 1,615 square feet of in-line fast-food/restaurant area for the 2020 tax year, and 2,000 square feet of end-cap fast-food restaurant with a drive thru area for the 2021, 2022, 2023, and 2024 tax years.

b.   Large retail

Paterson's expert identified the subject property's leases with DaVita and Family Dollar Stores, and seven other large retail comparable leases. The large retail comparable leases comprised leased areas of 7,127 to 48,905 square feet and bore lease commencement dates between March 2016 and June 2022.[11] The unadjusted rents ranged from $17.30 to $31.50 per square foot.[12] Paterson's expert relied on all seven comparable leases to discern his economic or market rent for what he characterized was the subject property's large retail areas for 2020, 2021, 2022, 2023, and 2024 tax years.

Paterson's expert applied a downward 5% adjustment to large retail comparable leases 1, 2, 3, and 4 to account for the perceived superior location of these properties. In addition, Paterson's expert applied a downward 5% quality adjustment to large retail comparable leases 1, 2, and 5,

---

[11]  Paterson's expert testified that he considered the subject property's leases with DaVita and Family Dollar Stores in arriving at his conclusion of economic or market rent. Notably however, he did not include those leases in his adjustment grids, his range of unadjusted rents, or in his "Summary" of the unit prices for the large retail comparable properties.
[12]  Including the subject property's lease with Family Dollar Stores, the unadjusted rents ranged from $12.30 to $31.50 per square foot.






and a downward 10% quality adjustment to large retail comparable leases 6 and 7, to account for the perceived superior quality of their buildings. After applying the adjustments, the range of adjusted rents was $17.40 to $28.35 per square foot.[13] Paterson's expert concluded an economic or market rent of $23.00 per square foot for the subject property's large retail space. Paterson's expert applied the $23.00 per square foot economic rent to his estimated: (i) 15,296 square feet of large retail area, for the 2020 tax year; (ii) 18,832 square feet of large retail area, for the 2021 tax year; (iii) 18,882 square feet of large retail area, for the 2022 and 2023 tax years; and (iv) 19,502 square feet of large retail area, for the 2024 tax year.

      c.    Bank

Paterson's expert identified the subject property's 2015 option renewal bank lease with Valley National Bank, and six other retail bank comparable leases. The other comparable retail bank leases were in Paterson, Fairfield (Essex County), Livingston (Essex County), West Orange (Essex County), and Westwood (Bergen County). The retail bank comparable leases comprised leased areas of 2,070 to 4,578 square feet and bore commencement dates between February 2017 and August 2019. The unadjusted rents ranged from $28.35 to $66.99 per square foot.[14] Paterson's expert relied on the subject property's 2015 option renewal bank lease with Valley National Bank, and all six other retail bank comparable leases, to discern his economic or market rent for the subject property's retail bank area for the 2020, 2021, 2022, 2023, and 2024 tax years.

Paterson's expert applied a downward 5% location adjustment to retail comparable bank leases 2, 3, and 5, and a downward 10% location adjustment to retail bank comparable lease 5 to account for the perceived superior location of these properties. In addition, Paterson's expert

---

[13] Excluding the subject property's leases with DaVita and Family Dollar Stores.
[14] Excluding the subject property's 2015 option renewal bank lease with Valley National Bank.






applied a downward 10% quality adjustment to retail bank comparable leases 1, 2, and 3. Further, Paterson's expert applied a downward 10% condition adjustment to retail bank comparable leases 1 and 3, and a downward 5% location adjustment to retail bank comparable lease 4 to account for the perceived superior location of these properties. Finally, Paterson's expert applied a downward 20% expense adjustment to retail bank comparable lease 5 to account for it being a modified gross lease. After applying the adjustments, the range of adjusted rents was $26.93 to $53.59 per square foot.[15] Paterson's expert concluded an economic or market rent of $45.00 for the subject property's retail bank area and applied it to the subject property's 3,000 square feet of retail bank area for the 2020, 2021, 2022, 2023, and 2024 tax years.

### 3. Court analysis

At the outset, the court emphasizes that it found credibility issues persisted in aspects of both plaintiff's expert's and Paterson's expert's identification of comparable leases and their respective analyses. These credibility issues resulted in the court either rejecting or affording little weight to several comparable leases and thus, arriving at different economic or market rents.

### a. Existing fast-food/coffee shop area

For the 2020 and 2021 tax years, plaintiff's expert characterized the subject property as comprising 2,465 square feet of in-line retail.[16] In contrast, for the 2020 and 2021 tax years, Paterson's expert characterized the subject property as comprising 850 square feet of small retail area. The 1,615 square foot difference arises from how each expert characterized the existing Dunkin' Donuts fast-food/coffee shop tenancy at the subject property before it moved to its current

---

[15] Excluding the subject property's 2015 option renewal bank lease with Valley National Bank.

[16] In general, in-line stores are characterized as retail areas in shopping centers positioned between other retail stores with shared common walls, and occupying leased areas of approximately 1,000 to 5,000 square feet.






end-cap space with a drive-thru. The photographs and evidence disclose that, for the 2020 and 2021 tax years, the subject property's existing Dunkin' Donuts franchise was located adjacent to and sharing common walls with a hair salon and the Valley National Bank. Although it did not feature a drive-thru, as of the October 1, 2019 and October 1, 2020 valuation dates, the evidence clearly demonstrates that it was being operated as a fast-food/coffee shop restaurant. Therefore, the court finds Paterson's expert's conclusion that, for the 2020 and 2021 tax years, the existing Dunkin' Donuts should be valued as a fast-food/coffee shop restaurant, is more credible and supported by the evidence. Accordingly, the court finds that for the 2020 and 2021 tax years, the subject property possessed approximately 850 square feet of small retail area and 1,615 square feet of fast-food/coffee shop restaurant retail area.[17]

   b.    In-line and small retail

When attempting to discern market or economic rent, an appraiser should attempt to identify properties in the marketplace that are comparable to and competitive with the property being valued, having similar uses and characteristics, with leases bearing a commencement date on or about the valuation date involved. Here, although plaintiff's expert identified five in-line comparable leases, only in-line comparable lease 5, bore an effective date prior to the October 1, 2019 and October 1, 2020 valuation dates. Notably, four of plaintiff's expert's in-line comparable leases bore effective dates between September 2021 to December 2023, more than one to four years after the October 1, 2019 and October 1, 2020 valuation dates. Although the court acknowledges that plaintiff's expert's in-line comparable leases 1, 2, 3, and 4 bear unadjusted rents

---

[17] For the 2022, 2023, and 2024 tax years, the court finds that the subject property did not possess any in-line or small retail areas. Instead, it possessed 2,000 square feet of end-cap fast food restaurant with a drive-thru (Babson), 3,000 square feet of bank area (Valley National Bank) and 19,502 square feet of mid-size or large retail area (DaVita and Family Dollar Stores).






like in-line comparable lease 5, the court finds plaintiff's expert's comparable lease 5 to be the most credible, trustworthy, and reliable evidence of the economic or market rent as of the October 1, 2019 and October 1, 2020 valuation dates. Thus, the court affords plaintiff's expert's comparable in-line lease 5 the greatest weight and comparable in-line leases 1, 2, 3, and 4, little weight.

Moreover, cross-examination of Paterson's expert disclosed several missteps in his identification of alleged small retail comparable leases, reliance on lease renewals or lease extensions, and reliance on leases that he did not review or possess.

According to Paterson's expert, his small retail comparable lease 1 was being used as a retail eyeglass store. However, effective cross examination disclosed that Paterson's expert's small retail comparable lease 1 was apparently a Taco Bell fast-food restaurant. Moreover, cross-examination further revealed that Paterson's expert only possessed and reviewed a two-page "Second Lease Modification Agreement." Paterson's expert was further uncertain if he reviewed or had in his possession a copy of the original lease, or a copy of the "First Modification" to the lease. Thus, he was unable to offer any meaningful testimony regarding the terms of the original lease, the rent obligations thereunder, and whether any rental concessions were afforded by the landlord to the tenant. Additionally, cross-examination also revealed that the tenant apparently leased 2,500 square feet of first-floor retail area, and the basement, which Paterson's expert failed to disclose in his appraisal report or during direct examination.

Cross-examination further disclosed that Paterson's expert's small retail lease comparable 2 was a "First Extension Rider to Lease Agreement," not a new tenancy. Although Paterson's expert opined that he believed that there was a new meeting of the minds, additional cross-examination revealed that the rent fixed under the First Extension Rider to Lease Agreement was






ostensibly agreed upon between the parties under the rider to the original lease agreement in January 2013, approximately three years prior to execution of the First Extension Rider to Lease Agreement.[18]

Cross examination also disclosed that Paterson's expert's small retail comparable lease 3 was for the lease of 2,500 square feet of first-floor area, and 2,500 square feet of basement area. According to Paterson's expert his failure to identify the lease of the 2,500 square feet of basement area was a "oversight," but attempting to remedy this "oversight," he testified that it would not have affected his concluded economic rent. Importantly, cross-examination further revealed that under paragraph 10 of the lease agreement, the tenant is responsible for real estate taxes over the base year taxes. Thus, Paterson's expert's small retail lease comparable 3 is a modified gross lease, not a net lease, however, Paterson's expert failed to make the necessary adjustments to small retail comparable lease 3. Accordingly, Paterson's expert conceded that a downwards 20% adjustment should have been applied to his small retail lease comparable 3 to account for it being a modified gross lease, resulting in an adjusted lease price of $17.91 per square foot.

Effective cross examination further disclosed that the tenant under Paterson's expert's small retail lease comparable 8 had occupied that property since 1991. Moreover, the landlord and tenant had executed several renewals, extensions, addendum, and lease modification agreements over the ensuing 30 years, including the lease renewal identified by Paterson's expert. Although Paterson's expert testified that he verified the terms of the lease renewal with the property owner's tax appeal attorney, he did not confer with either the tenant or the landlord to ascertain whether they were unusually driven or motivated to ensure that the space remained occupied, or to remain

---

[18] There was an $99.00 annual difference in the rent payable for the renewal term under the original Rider to Lease Agreement and the First Extension Rider to Lease Agreement.






in possession of the property, and thus, were willing to accept a lower, or pay a higher, rent than the marketplace otherwise warranted.

The court finds that without an adequate understanding of the motivations of the parties, and whether the landlord or the tenant were unusually driven to execute a lease renewal, it cannot conclusively state that the lease renewal is reflective of economic or market rent. See Washington Shopping Center, Inc. v. Washington Twp., 32 N.J. 259, 292-293 (Tax 2021), aff'd, 33 N.J. Tax 89 (App. Div. 2022) (stating that "the motivations of a landlord or a tenant can shape how the rental rate is fixed in a lease modification, extension, or renewal. Tenants unwilling to incur costs associated with moving and relocating their business operations may be willing to pay a rent higher than the market. Conversely, landlords fearing that one tenant vacating will result in the mass exodus of tenants may be willing to offer a below-market rent to a tenant to entice them to remain. Without engaging in in-depth discussions with both the landlord and tenant to gain a better understanding and perspective of their relationship and what motivated them to execute the lease renewal, modification, or extension, it is of questionable usefulness."). Accordingly, for the foregoing reasons, the court finds Paterson's expert's small retail comparable leases 1, 2, 3, and 8 are not credible or reliable evidence of the economic or market rent of the subject property's in-line or small retail areas.

Therefore, after reviewing and analyzing the comparable in-line and small retail leases, and placing primary emphasis on plaintiff's expert's in-line comparable lease 5 ($20.30 P.S.F.) and Paterson's expert's small retail comparable lease 7 ($24.24 P.S.F.), the court concludes that the economic or market rent that should be ascribed to the subject property's 850 square feet of in-line or small-retail area is $22.00 per square foot, as of the October 1, 2019 and October 1, 2020 valuation dates.






c.      Fast-food restaurant/coffee shop without a drive-thru

As stated above, for the 2020 and 2021 tax years, the court found that the subject property possessed 1,615 square feet of fast-food restaurant/coffee shop retail area without a drive-thru. Thus, the court will examine the fast-food restaurant/coffee shop leases offered by the experts to discern an economic or market rent for the 1,615 square feet as of the October 1, 2019 and October 1, 2020 valuation dates.

At the outset the court emphasizes that plaintiff's expert's four fast-food restaurant/coffee shop comparable leases all contain a drive-thru. Thus, the court does not find the four fast-food restaurant/coffee shop with a drive-thru comparable leases offered by plaintiff's expert are comparable to and competitive with the subject property's fast-food restaurant/coffee shop that did not have a drive-thru as of the October 1, 2019 and October 1, 2020 valuation dates. Accordingly, the court affords plaintiff's expert's four fast-food restaurant/coffee shop comparable leases little weight as of the October 1, 2019 and October 1, 2020 valuation dates.

Paterson's expert identified four fast-food restaurant leased properties. Notably however, three of the four fast-food restaurant comparable leases were outside of Paterson. Paterson's expert's fast-food restaurant comparable lease 4 was in Union City (Hudson County), comparable lease 5 was in Fairfield (Essex County), and comparable lease 9 was in North Bergen (Hudson County). Although Paterson's expert opined that fast-food restaurant comparable lease 5 was in a superior location, applying a downward 5% location adjustment, Paterson's expert offered little testimony, empirical evidence, or data supporting how he arrived at the downward 5% adjustment. Moreover, Paterson's expert's fast-food restaurant comparable leases 4, 5, and 9 were located a significant distance from Paterson and not in a similar urban setting. Thus, the court does not find Paterson's expert's fast-food restaurant comparable leases 4, 5, and 9, to be comparable to the






subject property and in the subject property's competitive market area. Accordingly, the court affords Paterson's expert's fast-food restaurant comparable leases 4, 5, and 9, little weight.

However, Paterson's expert's fast-food restaurant comparable lease 6 was a 1,985 square foot restaurant without a drive-thru in Paterson, having an effective rent of $33.85 per square foot, and bearing a February 1, 2018 lease date. Thus, Paterson's expert's fast-food restaurant comparable lease 6 was in Paterson, has a similar size, was being similarly used, had a comparable urban location, and was timely for the October 1, 2019 and October 1, 2020 valuation dates. Therefore, after reviewing and analyzing the fast-food restaurant comparable leases and placing primary emphasis on Paterson's expert's fast-food restaurant comparable lease 6, the court concludes that an economic or market rent of $34.00 per square foot should be ascribed to the subject property's 1,615 square feet of fast-food restaurant/coffee shop without a drive-thru area, as of the October 1, 2019 and October 1, 2020 valuation dates.

### d. Fast-food restaurant/coffee shop with a drive thru

Here, both experts identified and relied on the subject property's lease with Babson as a fast-food restaurant/coffee shop with a drive-thru comparable lease. That lease has an effective annual rent of $52.01 per square foot over the 20-year lease term.

Notably, plaintiff's expert characterized the lease with Babson as having an effective rent of $44.78 per square foot, averaging the annual rent over the first 10 years of the lease term.[19] According to plaintiff's expert "the subject Dunkin' Donuts is a 20-year lease, . . . that's a rather long lease, . . . I abbreviated it, and I calculated the rental over the next ten years, so I did not carry out to its initial term all the way to the end . . . I calculated the effective rent over the first ten years,

---

[19] In the Addenda to his appraisal report, plaintiff's expert stated that "[t]he full subject lease has a 240-month term, with an effective rent of $52.01" per square foot.






. . . I thought a ten-year term applicable to the tax years in question was a fair and easy methodology."

The court's review of plaintiff's expert's fast-food restaurant/coffee shop with a drive-thru comparable leases reveals a lease term ranging from 60 to 240 months, with an average lease term of 135 months. Moreover, by excluding the subject property's 240-month lease, the average lease term drops to 100 months. Similarly, Paterson's expert's fast-food restaurant comparable leases disclose lease terms ranging from 60 to 180 months, with an average lease term of 117 months. Therefore, the court finds plaintiff's expert's testimony credible, that the subject property's 240-month lease with Babson exceeds marketplace norms. Accordingly, the court accepts plaintiff's expert's computation of the effective rent for the subject property's end-cap fast-food restaurant/coffee shop with a drive thru as $44.78 per square foot.

In addition, three of plaintiff's expert's fast-food restaurant/coffee shop with a drive thru comparable leases are in rural and suburban areas including Newton (Sussex County), Perth Amboy (Middlesex County), and West Long Branch (Monmouth County). Notably, plaintiff's expert found no location adjustment was warranted to any of these three fast-food restaurant/coffee shop comparable leases. As a result, plaintiff's expert opined that the economic or market rent that should be ascribed to the subject property's fast-food restaurant/coffee shop with a drive-thru is $35.00 per square foot for the 2022, 2023 and 2024 tax years.

However, the court does not find the three comparable leased properties identified by plaintiff's expert were in locations or settings comparable to and competitive with the subject property's market. Candidly stated, the court does not find plaintiff's expert's testimony that no upwards location adjustment was warranted to any of his three fast-food restaurant/coffee shop with a drive-thru comparable leases to be credible. The three comparable leased properties were






in rural or suburban settings in Sussex County, Middlesex County, and Monmouth County. Plaintiff's expert report and testimony revealed that, as of the 2020 Census, Paterson was a densely populated city, occupied by approximately 160,000 residents, with approximately 50,887 residents living within 1 mile of the subject property (which apparently excludes the population in North Haledon, immediately adjacent to the subject property). No testimony or data was elicited by plaintiff's expert that the three comparable leased properties were surrounded by populations akin to the subject property. Additionally, two of the fast-food restaurant/coffee shop with a drive-thru comparable leases identified by plaintiff's expert were freestanding or stand-alone buildings, and not the end-cap retail area of a shopping center. Thus, for the foregoing reasons, the court does not find plaintiff's expert's fast-food restaurant/coffee shop with a drive-thru comparable leases 1, 2, and 4 to be credible evidence of the subject property's economic or market rent.

As highlighted above, in addition to the subject property's end-cap fast-food restaurant/coffee shop with drive-thru lease with Babson, Paterson's expert identified four fast-food restaurant comparable leases in Paterson, Union City (Hudson County), Fairfield (Essex County), and North Bergen (Union County). Notably however, except for the subject property's lease with Babson, none of the other fast-food restaurant/coffee shop leases identified by Paterson's expert possessed a drive-thru.

Effective cross-examination further disclosed that Paterson's expert did not possess, nor review a copy of the lease, nor any lease abstract for his fast-food restaurant comparable lease 4. Rather, Paterson's expert only reviewed a response from the property owner to the Union City's Tax Assessor's request for income and expense information. Although Paterson's expert expressed that he did not believe the tenant was responsible for any common area maintenance charges, he could not definitively state that, because he did not possess or review a copy of the






lease. Moreover, the court's review of the property owner's response to the request for income and expense information discloses that it was characterized by the property owner as a "Renegotiated Lease," suggesting that the lease terms were either modified or amended from those originally negotiated. However, since Paterson's expert did not possess or review a copy of either the original lease or the modified or renegotiated lease, he did not know what terms or provisions were modified or amended. Thus, for the above reasons, the court does not find Paterson's expert's fast-food restaurant comparable lease 4 credible evidence of economic or market rent.

In addition, cross-examination disclosed that Paterson's expert's fast-food restaurant comparable lease 5 is a "highway location," along U.S. Highway Route 46. Accordingly, Paterson's expert applied a downward 5% adjustment for what he categorized was its "superior" location. In response to cross-examination questioning regarding how he arrived at that adjustment, Paterson's expert offered, "looking at the subject rental, in comparison to the other rentals, . . . my analysis was that 5% or $2.00 per square foot was appropriate." In addition, no analysis or data was contained in Paterson's expert's appraisal report demonstrating how he arrived at the 5% downward location adjustment.

Adjustments must have a foundation obtained from data extracted from the marketplace, market-derived sources or objective data, and not be based on subjective observations and/or personal experiences. An appraiser's adjustments "must have a foundation obtained from the market. . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Ibid. When an expert "offers an opinion without providing specific underlying reasons . . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), certif. denied, 145 N.J. 374






(1996)).  The expert is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid.  When an expert's opinion lacks a reliable foundation, supported by facts and market data, "the court cannot extrapolate value." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980).  Thus, when an expert does not provide a sufficient explanation for his adjustments, rooted in fact and an analysis of market data, "the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, Paterson's expert failed to offer any meaningful evidence, facts, data, or testimony to the court supporting his location adjustment to fast-food restaurant comparable lease 5.  Thus, for the above reasons, the court does not find Paterson's expert's fast-food restaurant comparable lease 5 credible evidence of economic or market rent.

Importantly, none of Paterson's expert's four fast-food restaurant comparable leases contain a drive-thru, a potentially significant and materially distinctive feature that may impact their economic or market rent.  The court highlights that the subject property's end-cap drive-thru lease with Babson is $6.98 per square foot more than Paterson's expert's fast-food restaurant comparable lease 5, $10.93 per square foot more than Paterson's expert's fast-food restaurant comparable lease 6, and $10.83 per square foot more than Paterson's expert's fast-food restaurant comparable lease 9.  The court cannot help but question what impact or role the lack of a drive-thru has on the comparable leases markedly lower rents than the subject property's $44.78 per square foot lease with Babson.  Unfortunately, no meaningful testimony was elicited from Paterson's expert during trial explaining the significance of this discrepancy.  Accordingly, for the above-stated reasons, the court does not find Paterson's expert's fast-food restaurant comparable leases 4, 5, 6, and 9 credible evidence of the economic or market rent that should be ascribed to a






fast-food restaurant/coffee shop with a drive thru for the 2022, 2023, or 2024 tax years.

Rather, the court finds the best evidence of economic or market rent, is the subject property's lease with Babson of the end-cap fast-food restaurant/coffee shop with a drive thru. Therefore, the court finds that the economic or market rent which should be ascribed to the subject property's 2,000 square foot end-cap fast-food restaurant/coffee shop with a drive thru retail area is $44.78 per square foot.

e.    Mid-size and large retail

The court finds that whether the more sizeable retail areas of the subject property are categorized as "mid-size" or "large retail," is a matter of perception. The "mid-size" comparable leases offered by plaintiff's expert range in size from 9,120 to 17,280 square feet, with median value of 10,400 square feet, and the "large retail" comparable leases offered by Paterson's expert range in size from 7,127 to 48,905 square feet, with a median value of 9,502 square feet. Thus, although the experts identified the subject property's more sizeable retail areas by different names, both experts utilized a similar building size framework to identify retail leases that they found comparable with the subject property.

Moreover, as stated at the outset, the court found the subject property has a gross rentable area of 24,502 square feet. Although plaintiff undertook renovations to the façade of the subject property and relocated certain tenant space, no testimony or evidence was elicited that the shopping center's building footprint was made larger. Thus, the court finds that the subject property comprised 19,037 square feet of mid-size or large retail area for the 2020 and 2021 tax years,[20] and 19,502 square feet of mid-size or large retail area for the 2022, 2022, 2023, and 2024 tax

---

[20] 24,502 gross sq. ft. − 1,615 sq. ft − 3,000 sq. ft. − 850 sq. ft. = 19,037 sq. ft.






years.[21]

Importantly, the court highlights that all five of plaintiff's expert's mid-size comparable leases were in Paterson (including the subject property leases with DaVita and Family Dollar Stores). Whereas, excepting the subject property leases with DaVita and Family Dollar Stores, only one of Paterson's expert's large retail comparable leases was in Paterson (large retail comparable lease 5). Notably, Paterson's expert's large retail comparable lease 5, the only comparable lease offered by Paterson's expert in Paterson, was the lowest rent of his seven comparable leases.

The court does not find Paterson's expert use of comparable leases in North Bergen (Hudson County), and Fairfield (Essex County), accurately depicts or gauges the economic or market rent of a mid-size or large retail area in Paterson. Moreover, Paterson's expert's unsubstantiated and haphazard application of location adjustments to only certain North Bergen comparable leases, as possessing a superior location, and failure to ascribe a location adjustment to other North Bergen comparable leases, in the court's view, produced an untrustworthy result. Therefore, the court rejects Paterson's expert's large retail comparable leases 1, 2, 3, 4, 6, and 7.

Additionally, the court finds that both plaintiff's expert's adjustments and Paterson's adjustments lacked any foundation obtained from the marketplace, market-derived sources or objective data. As stated above, an appraiser's adjustments "must have a foundation obtained from the market. . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Ibid. Therefore, the court must disregard

---

[21] 24,502 gross sq. ft. – 2,000 sq. ft. – 3,000 sq. ft. = 19,502 sq. ft.






the experts' condition and quality adjustments.

The court's further review and analysis of the mid-size comparable leases (plaintiff's expert's comparable leases 1, 2, 3, 4, and 5) and large retail comparable leases (Paterson's expert's comparable lease 5), all which are in Paterson, disclose the following:

|  | 2020 to 2021 | 2022 to 2024 |
|---|---|---|
| Unadjusted rent | $15.50 to $21.12 P.S.F. ($18.84 P.S.F. Mean) | $12.40 to $17.30 P.S.F. ($15.50 P.S.F. Mean) |
| Square footage | 9,120 to 17,280 sq. ft. | 10,300 to 48,905 sq. ft. |

For the 2020 and 2021 tax years, the court places the greatest weight on the subject property's lease with DaVita ($19.92 per square foot). Moreover, the court finds credible Paterson's expert's testimony that Family Dollar Stores typically pay below market rents. Therefore, for the 2022, 2023 and 2024 tax years, the court places primary emphasis on the unadjusted rents of plaintiff's expert's mid-size comparable lease 1 ($16.79 P.S.F.) and Paterson's expert's large retail comparable lease 5 ($17.30 P.S.F.). Accordingly, the court finds that the economic or market rent that should be ascribed to the subject property's mid-size or large retail area is $19.00 per square foot for the 2020 and 2021 tax years. In addition, the court finds that the economic or market rent that should be ascribed to the subject property's mid-size or large retail area is $17.00 per square foot for the 2022, 2023, and 2024 tax years.

f.   Bank retail

Plaintiff's expert identified the subject property's 2015 renewal lease with Valley National Bank and four other retail bank leased properties. Notably however, none of the four retail bank properties were in Paterson. Although plaintiff's expert expressed that retail bank comparable leases 1, 2, 3, and 4 were in superior locations, applying a downward 10% adjustment to them, plaintiff's expert offered little meaningful testimony, empirical evidence, or data supporting how


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



he arrived at the downward 10% location adjustment. Importantly, plaintiff's expert's retail bank comparable leases 1, 3, and 4 were a significant distance from Paterson in Rockaway (Morris County), Edison (Middlesex County), and Westwood (Bergen County). Plaintiff's expert offered no testimony or evidence demonstrating that these suburban markets were like Paterson's urban market. Accordingly, the court affords plaintiff's expert's retail bank comparable leases 1, 3, and 4, little weight.

Additionally, the court highlights that the subject property's June 2015 lease with Valley National Bank was a lease renewal, not a newly renegotiated lease agreement. Valley National Bank originally leased its bank retail space in the subject property under a July 2005 lease agreement. Plaintiff's expert offered testimony during trial regarding his familiarity with the representative from Valley National Bank responsible for negotiating the subject property's original lease agreement. However, plaintiff's expert offered no evidence that the original lease terms were renegotiated in June 2015. To the contrary, Valley National Bank apparently simply exercised its option to renew the lease at the rent fixed under the original 2005 lease agreement. Thus, the court finds that when the mechanism used to calculate the renewal lease rent was fixed under the 2005 lease, the rent payable under the renewal lease is not an accurate gauge of market or economic rent. Therefore, the court affords the subject property's June 2015 lease renewal with Valley National Bank little weight.

However, plaintiff's expert's comparable bank lease 2 was in Clifton (Passaic County), approximately six miles from the subject property, having rented in May 2018 for $33.60 per square foot. Thus, due to its geographic proximity to the subject property, the court finds plaintiff's expert's retail bank comparable lease 2 to be comparable to the subject property and in the subject property's competitive market area.






Paterson's expert identified the subject property's 2005 original lease with Valley National Bank and six other retail bank leased properties. Notably however, except for Paterson's expert's bank retail lease comparable 4, none of the remaining retail bank retail comparable leases were in Paterson. Moreover, although Paterson's expert expressed that retail bank comparable leases 2, 3, 5, and 6 were in superior locations, applying downward 5% to 10% adjustments, Paterson's expert offered little meaningful testimony, empirical evidence, or data supporting how he arrived at the adjustments. Importantly, Paterson's expert's retail bank comparable leases 1, 2, 3, 5, and 6 were located a significant distance from Paterson in Fairfield (Essex County), Livingston (Essex County), West Caldwell (Essex County), and West Orange (Essex County). However, Paterson's expert offered no testimony or evidence demonstrating that these suburban and affluent markets were like Paterson's urban market. Accordingly, the court affords Paterson's expert's retail bank comparable leases 1, 2, 3, 5, and 6, little weight.

However, Paterson's expert's retail bank comparable lease 4 was in Paterson, approximately 1.8 miles from the subject property, and rented in March 2018 for $28.35 per square foot. Thus, Paterson's expert's comparable bank lease 4, was timely, is situated in the competitive Paterson urban market, and is near the subject property. Accordingly, the court finds Paterson's expert's bank retail comparable lease 4 to be credible evidence of economic or market rent.

Therefore, placing primary emphasis on plaintiff's expert's bank retail lease comparable 2 ($33.60 P.S.F.) and Paterson's expert's bank retail lease comparable 4 ($28.35 P.S.F.), the court finds that the economic or market rent that should be ascribed to the subject property's bank retail area is $31.00 per square foot for the 2020, 2021, 2022, 2023, and 2024 tax years.

B.    Vacancy and collection loss

Vacancy and collection losses are "usually estimated as a percentage of potential gross






income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate 478 (14th ed. 2013).

Plaintiff's expert examined the subject property's historical vacancy rates, which ranged from 77.77% for the 2020 and 2021 tax years, to 0% for the 2022, 2023, and 2024 tax years, which plaintiff's expert averaged to 31.11% for the five-year period. In addition, plaintiff's expert generated a retail market building vacancy report utilizing CoStar, analyzing one hundred ten retail buildings, consisting of 10,000 to 50,000 square feet, within a two-mile radius of the subject property. According to plaintiff's expert, the retail market building vacancy report disclosed vacancy rates ranging from 2.7% to 6% during the valuation years under appeal. Accordingly, plaintiff's expert opined that a stabilized vacancy rate of 15%, and collection loss factor of 2.5%, or a total vacancy and collection loss rate of 17.5%, should be applied for the 2020 and 2021 tax years, and that a stabilized vacancy rate of 7.5%, and collection loss factor of 2.5%, or a total vacancy and collection loss rate of 10%, should be applied for the 2022, 2023, and 2024 tax years.

Similarly, Paterson's expert reviewed the subject property's historical vacancy rates. In addition, he reviewed vacancy reports from the PwC Investor Surveys for the National Strip Shopping Center Market. According to Paterson's expert, the survey data revealed the following range of vacancy rates: (i) 2.5% to 10%, in the 3rd Quarter 2019; (ii) 2.5% to 12%, in the 3rd Quarter 2020; (iii) 2.5% to 18%, in the 3rd Quarter 2021; (iv) 1% to 18%, in the 3rd Quarter 2022; and (v) 1% to 18%, in the 3rd Quarter 2023. Accordingly, Paterson's expert opined a stabilized vacancy and collection loss rate of 5% for the 2020, 2021, 2022, 2023 and 2024 tax years.

The court's own review of the subject property's historical vacancy rates discloses that






although the subject property experienced an abnormally high vacancy rate in 2020 and 2021, such vacancy was largely attributable to the loss of its principal tenant, Rite Aid/Walgreens. However, after plaintiff performed improvements to and reconfigured the shopping center, it achieved a 0% vacancy rate in 2022, 2023, and 2024. In addition, the court's review of the CoStar vacancy report commissioned by plaintiff's expert demonstrates that within a two-mile radius the subject property, the vacancy rates were: (i) 4.1%, in the 3rd Quarter 2019; (ii) 5.5%, in the 3rd Quarter 2020; (iii) 4.9%, in the 3rd Quarter 2021; (iv) 2.8%, in the 3rd Quarter 2022; and (v) 3.2%, in the 3rd Quarter 2023.

After considering the experts' testimony and reviewing the above data and information, the court finds that a vacancy rate of 5%, and a collection loss factor of 2.5% is supported by the data and trial testimony. Therefore, the court will apply a vacancy and collection loss factor of 7.5% to the subject property for the 2020, 2021, 2022, 2023, and 2024 tax years

### C.   Operating expenses

The next step under the income capitalization approach is determination of the appropriate stabilized operating expenses. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management." The Appraisal of Real Estate, at 479.

In determining the stabilized operating expenses that should be applied to the subject property's reconstructed operating statements both experts reviewed the subject property's historical operating expenses. In addition, plaintiff's expert reviewed the expenses from three shopping centers in Wayne (Passaic County), Clifton (Passaic County), and Rockaway (Morris County).

Overall, the experts' opinions regarding three categories of stabilized operating expenses






(management/administrative fees, leasing commissions, and structural reserves) to be applied to the subject property's Effective Gross Income were nearly identical. The only category of stabilized operating expense where the experts' opinions diverged was for tenant improvement allowances. The below chart sets forth the experts' concluded stabilized expenses:

| Stabilized expense | Plaintiff's expert | Paterson's expert |
|---|---|---|
| management & administration | 5% EGI | 5% EGI |
| leasing commissions | 3.5% EGI | 3% EGI |
| replacement reserves | $0.35 P.S.F. or 2% & 2.33% EGI | 2% EGI |
| tenant improvement allowance | $1.50 P.S.F. | None |

According to plaintiff's expert, management and administrative fees in Neighborhood Shopping Centers like the subject property typically range from 3% to 5% of Effective Gross Income. Accordingly, plaintiff's expert concluded that a 5% management and administrative fee was appropriate. Similarly, Paterson's expert concluded a 5% management and administrative fee was reasonable for the subject property. The court finds the experts' conclusions are reasonable and supported by the evidence. Therefore, the court accepts and will apply a management and administrative fee of 5% of the subject property's reconstructed Effective Gross Income.

Plaintiff's expert testified that based on his survey of local commercial real estate brokers, leasing commissions in Neighborhood Shopping Centers typically range from 3% to 5% of the aggregate rent, depending on the number of tenants and the size of the property. Accordingly, plaintiff's expert opined that a leasing commission expense of 3.5% of the subject property's Effective Gross Income was reasonable. Paterson's expert similarly surveyed local commercial real estate brokers, finding that leasing commissions are generally 3% of the aggregate rent. Thus, Paterson's expert opined that a leasing commission expense of 3% of the subject property's Effective Gross Income was reasonable. The court finds that a 3.5% leasing commission expense


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



is reasonable and supported by the evidence. Therefore, the court accepts and will apply a leasing commission expense of 3.5% of the subject property's reconstructed Effective Gross Income.

Plaintiff's expert expressed that based on his review of PwC Investor Surveys of the National Strip Center Market, for the 2019 through 2023 tax years, replacement reserves ranged from $0.10 to $1.00 per square foot. Thus, he opined that a replacement reserve allowance of $0.35 per square foot of gross building area should be applied for anticipated structural repairs to the subject property. Paterson's expert similarly opined that a replacement reserve for structural repairs of 2% of Effective Gross Income should be applied. The court finds that a 2% replacement reserve expense is reasonable and supported by the evidence. Therefore, the court accepts and will apply a replacement reserve expense of 2% of the subject property's reconstructed Effective Gross Income.

Finally, plaintiff's expert testified that based on his review of retail leases and work letters in the subject property's market area, landlords afford a tenancy improvement allowance of between $10.00 to $20.00 per square foot. According to plaintiff's expert, the plaintiff incurred approximately $307,549 to renovate the subject property's exterior façade and to relocate certain tenant space. In his estimation, tenant improvements have a life span of ten years, thus, he concluded that a tenant improvement allowance of $15.00 per square foot, or $1.50 per square foot annually should be applied to the subject property. In contrast, Paterson's expert opined that tenant improvement allowances for retail space are not customary in the Paterson marketplace.

In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as






tenant improvement/fit-up allowances. The cost of these allowances are often built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

The court finds plaintiff's expert's testimony that: (i) tenancy improvement allowances range between $10.00 to $20.00 per square foot for retail space in the subject property's market area; and (ii) tenant improvements have a typical life span of ten years, to be more credible and reasonable. However, the court does not find that plaintiff's expert's allocation of the $307,549 expended by plaintiff, in support of his $15.00 per square foot tenant improvement allowance, is accurate. The subject property's photos before and after the work demonstrate that capital improvements and renovations were made by plaintiff to the subject property's exterior façade, which, the court finds are not tenant improvement allowances. In general, tenant improvement allowances incorporate "substantial interior improvements" to the leased area. Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). The court's review of the itemized construction cost breakdown reveals that approximately $43,209.14 of the $307,548.67 were categorized as renovation costs, or renovations to the subject property's exterior façade.[22] Thus, plaintiff's actual tenant improvement and tenant relocation costs were approximately $264,339.53, or approximately $10.78 per square foot. Accordingly, the court accepts as credible and reasonable a $10.00 per square foot tenant improvement allowance, and plaintiff's expert's ten-year life span for the tenancy improvements. Therefore, the court will apply an annual tenant improvement allowance of $1.00 per square foot to the subject property's reconstructed Effective Gross Income.

---

[22] In addition, it is likely that some portion of the itemized architectural costs ($7,250.00), engineering costs ($4,740.40) and permits ($9,377.45) were attributable to the plaintiff's exterior façade renovations.






D. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." Appraisal Institute, The Appraisal of Real Estate 491 (14th ed 2013); Prudential Ins. Co. of Am. v. Parsippany-Troy Hills Twp., 16 N.J. Tax 58, 60 (Tax 1995), aff'd, 16 N.J. Tax 148 (App. Div. 1996); Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of market value.

Here, in deriving their capitalization rates, plaintiff's expert and Paterson's expert reviewed published investor survey data and employed the band of investment technique. In addition, plaintiff's expert reviewed extracted capitalization rates from six retail shopping centers that sold between November 2019 and February 2023.

The investor surveys are completed by market participants. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. This court has "sanctioned" the use of data collected and commercially published by analytical firms and trade associations, such as American Council of Life Insurance ("ACLI"), PwC/Korpacz, and Real Estate Research Corporation ("RERC").[23] By scrutinizing and "analyzing this data, in toto, the

---

[23] The ACLI survey information represents actual transactions. However, the RERC and PwC investor survey data reflects a forecast of regional and institutional investors required or expected equity return on a 100% cash transaction. Stated differently, "[t]he RERC and [PwC] Korpacz data is based upon [forecasted] all cash transactions." Hull Junction Holding Corp., 16 N.J. Tax at 102. Notably, the band of investment technique employs both a mortgage financing component, and a cash equity investment component. Thus, as keenly observed by Judge Kuskin, "[w]here the cash investment, i.e., the equity investment, is only 25%-30% of the total investment, the equity dividend rate would tend to be lower than the [forecasted] all cash rate." Ibid.

   

court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Hull Junction Holding, 16 N.J. Tax. at 83.

The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Id. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "[b]and of [i]nvestment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. at 279-80).

To perform his band of investment technique and discern his mortgage interest rates, plaintiff's expert reviewed: (i) PwC Real Estate Investor Survey Yield Comparisons of Long-Term Mortgages as of October 1, 2019, October 1, 2020, October 1, 2021, October 1, 2022 and October 1, 2023; and (ii) ACLI Investment Bulletins, Retail Fixed Rate, for the 3rd Quarter 2019, 3rd Quarter 2020, 3rd Quarter 2021, 3rd Quarter 2022, and 3rd Quarter 2023. In addition, to discern his equity dividend rates, plaintiff's expert reviewed PwC Real Estate Investor Surveys, National Strip Shopping Center Market, for the 3rd Quarter 2019, 3rd Quarter 2020, 3rd Quarter 2021, 3rd Quarter 2022, and 3rd Quarter 2023.

Paterson's expert, in performing his band of investment technique, reviewed the ACLI Investment Bulletins, Retail properties, for the 3rd Quarter 2019, 3rd Quarter 2020, 3rd Quarter 2021, 3rd Quarter 2022, and 3rd Quarter 2023, to derive his mortgage interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates. In addition, Paterson's expert testified






that he also reviewed capitalization rate investor survey data published by PwC/Korpacz for the National Strip Shopping Center Market National Apartment Market for the 3rd Quarter 2019, 3rd Quarter 2020, 3rd Quarter 2021, 3rd Quarter 2022, and 3rd Quarter 2023.

The following charts detail the components of the experts' band of investment analysis and their derived band of investment base capitalization rates for each tax year involved herein:

2020 tax year

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Plaintiff's expert | 4% | 75% | 25 years | 6.75% | 6.44% |
| Paterson's expert | 4% | 60% | 30 years | 7% | 6.25% |

2021 tax year

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Plaintiff's expert | 4% | 75% | 25 years | 6.75% | 6.44% |
| Paterson's expert | 3.75% | 60% | 30 years | 6% | 5.70% |

2022 tax year

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Plaintiff's expert | 4% | 75% | 25 years | 7% | 6.50% |
| Paterson's expert | 3.5% | 60% | 30 years | 7% | 6.00% |

2023 tax year

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Plaintiff's expert | 5.50% | 75% | 25 years | 7% | 7.28% |
| Paterson's expert | 5.20% | 60% | 30 years | 5.75% | 6.25% |

2024 tax year

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Plaintiff's expert | 6.50% | 75% | 25 years | 7% | 7.83% |
| Paterson's expert | 6.40% | 60% | 30 years | 6% | 6.90% |

The court's review and analysis of the PwC Investor Surveys and ACLI Investment Bulletin data for the retail sector relied on by plaintiff's expert and Paterson's expert, reveals the following range of interest rates, loan-to-value rates, and capitalization rates:






|  | 3rd Quarter 2019 | 3rd Quarter 2020 | 3rd Quarter 2021 | 3rd Quarter 2022 | 3rd Quarter 2023 |
|---|---|---|---|---|---|
| ACLI Bulletins[24] | | | | | |
| Interest rates | 3.95% - 4.16% | 3.68% - 3.82% | 3.46% - 3.61% | 4.78% - 5.52% | 6.05% - 6.47% |
| Loan-to-value ratios | 61.52% - 66.48% | 50.90% - 57.86% | 51.40% - 66.67% | 52.51% - 61.32% | 48.93% - 64.02% |
| Capitalization rates | 5.63% - 7.18% | 4.52% - 6.75% | 5.79% - 6.77% | 6.39% - 7.08% | 6.13% - 7.26% |
| PwC/Korpacz | | | | | |
| Capitalization rates | 4.50% - 10% | 4.75% - 10% | 5% - 10% | 5% - 10% | 5% - 10% |
| Average | 6.77% | 6.84% | 7.29% | 7.14% | 7.16% |

Accordingly, based on the court's review of the above data and information, and in consideration of both experts' testimony, the court finds that, as of the October 1, 2019 valuation date, the experts' 4% mortgage interest rate is credible, Paterson's expert's 60% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and plaintiff's expert's 6.75% equity dividend rate is more credible. Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2019 valuation date, is 6.50% (6.334 constant x 60% = 3.80% & 6.75% x 40% = 2.70%, 3.80% + 2.70% = 6.50%).

In addition, the court finds that, as of the October 1, 2020 valuation date, plaintiff's expert's 4% mortgage interest rate is more credible, Paterson's expert's 60% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and plaintiff's expert's 6.75% equity dividend rate is more credible. Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2020 valuation date, is 6.50% (6.334 constant x 60% = 3.80% & 6.75% x 40% = 2.70%, 3.80% + 2.70% = 6.50%).

The court further finds that, as of the October 1, 2021 valuation date, a 3.75% mortgage

---

[24] The ACLI Investment Bulletin for: (i) Fixed Rate - Retail; (ii) Fixed Rate Retail - $5 million - $14.999 million; (iii) Fixed Rate Retail - Mid-Atlantic region; and (iv) Fixed Rate Retail – Less than 50,000 sq. ft.

   

interest rate is most credible,[25] Paterson's expert's 60% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that both experts 7% equity dividend rate is credible. Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2021 valuation date, is 6.50% (6.170 constant x 60% = 3.70% & 7% x 40% = 2.80%, 3.70% + 2.80% = 6.5%).

The court further finds that, as of the October 1, 2022 valuation date, plaintiff's expert's 5.50% mortgage interest rate is more credible, Paterson's expert's 60% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that Paterson's expert's 5.75% equity dividend rate is more credible. Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2022 valuation date, is 6.72% (7.369 constant x 60% = 4.42% & 5.75% x 40% = 2.30%, 4.42% + 2.30% = 6.72%).

Finally, the court finds that, as of the October 1, 2023 valuation date, plaintiff's expert's 6.50% mortgage interest rate is more credible, Paterson's expert's 60% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that Paterson's expert's 6% equity dividend rate is more credible. Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2023 valuation date, is 7.26% (8.102 constant x 60% = 4.86% & 6% x 40% = 2.40%, 4.86% + 2.40% = 7.26%).

---

[25] The ACLI Investment Bulletins data revealed that mortgage interest rates in the 3rd Quarter 2021 were lower than the mortgage interest rates in 3rd Quarters during the prior two years. In the 3rd Quarter 2021, the ACLI Bulletin mortgage interest rates ranged from 3.46% - 3.61%, for institutional investor grade property. The subject property is not institutional investor grade thus, the court finds that the mortgage interest rate applicable to the subject property would likely fall above the ACLI Bulletin published rates. Thus, the court finds that a 3.75% mortgage interest rate is reasonable for the subject property and is supported by the published data.






Accordingly, the subject property's reconstructed operating statements for the 2020, 2021, 2022, 2023, and 2024 tax years are set forth below:

**2020 and 2021 Tax Years**

INCOME:

| | |
|---|---|
| In-line retail area @ 850 sq. ft. x $22.00 P.S.F. | $ 18,700 |
| Fast-food without drive-thru @ 1,615 sq. ft. x $34.00 P.S.F. | $ 54,910 |
| Mid-size retail area @ 19,037 sq. ft. x $19.00 P.S.F. | $361,703 |
| Bank retail area @ 3,000 sq. ft. x $31.00 P.S.F. | $ 93,000 |
| TOTAL:       POTENTIAL GROSS INCOME | $528,313 |
| LESS:       Vacancy & Collection Loss @ 7.5% | ($ 39,623) |
| | $488,690 |
| OTHER INCOME: Signage | $ 3,960 |
| TOTAL:       EFFECTIVE GROSS INCOME | $492,650 |

| STABILIZED EXPENSES: | | |
|---|---|---|
| Management/Admin.  @ 5% of EGI | $24,633 | |
| Repl. Reserves       @ 2% of EGI | $ 9,853 | |
| Leasing commission  @ 3.5% of EGI | $17,243 | |
| Tenant Improvement  @ $1.00 P.S.F. | $24,502 | |
| TOTAL: STABILIZED EXPENSES | ($76,231) | |

| | | |
|---|---|---|
| NET OPERATING INCOME | | $416,419 |
| Capitalization Rate          6.50% | | |
| MARKET VALUE: | | $6,406,446 |


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



**2022 Tax Year**

INCOME:

| | |
|---|---|
| Fast-food with drive-thru @ 2,000 sq. ft. x $44.78 P.S.F. | $ 89,560 |
| Mid-size retail area @ 19,502 sq. ft. x $17.00 P.S.F. | $331,534 |
| Bank retail area @ 3,000 sq. ft. x $31.00 P.S.F. | $ 93,000 |
| TOTAL: POTENTIAL GROSS INCOME | $514,094 |
| LESS: Vacancy & Collection Loss @ 7.5% | ($ 38,557) |
| | $475,537 |
| OTHER INCOME: Signage | $ 3,960 |
| TOTAL: EFFECTIVE GROSS INCOME: | $479,497 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Management/Admin. @ 5% of EGI | $23,975 | |
| Repl. Reserves @ 2% of EGI | $ 9,590 | |
| Leasing commission @ 3.5% of EGI | $16,782 | |
| Tenant Improvement @ $1.00 P.S.F. | $24,502 | |
| TOTAL: STABILIZED EXPENSES | ($74,849) | |

| | | |
|---|---|---|
| NET OPERATING INCOME | | $404,648 |
| Capitalization Rate | 6.50% | |
| MARKET VALUE: | | $6,225,354 |

**2023 Tax Year**

INCOME:

| | |
|---|---|
| Fast-food with drive-thru @ 2,000 sq. ft. x $44.78 P.S.F. | $ 89,560 |
| Mid-size retail area @ 19,502 sq. ft. x $17.00 P.S.F. | $331,534 |
| Bank retail area @ 3,000 sq. ft. x $31.00 P.S.F. | $ 93,000 |
| TOTAL: POTENTIAL GROSS INCOME | $514,094 |
| LESS: Vacancy & Collection Loss @ 7.5% | ($ 38,557) |
| | $475,537 |
| OTHER INCOME: Signage | $ 3,960 |
| TOTAL: EFFECTIVE GROSS INCOME: | $479,497 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Management/Admin. @ 5% of EGI | $23,975 | |
| Repl. Reserves @ 2% of EGI | $ 9,590 | |
| Leasing commission @ 3.5% of EGI | $16,782 | |
| Tenant Improvement @ $1.00 P.S.F. | $24,502 | |
| TOTAL: STABILIZED EXPENSES | ($74,849) | |

| | | |
|---|---|---|
| NET OPERATING INCOME | | $404,648 |
| Capitalization Rate | 6.72% | |
| MARKET VALUE | | $6,021,548 |






**2024 Tax Year**

INCOME:

| | |
|---|---|
| Fast-food with drive-thru @ 2,000 sq. ft. x $44.78 P.S.F. | $ 89,560 |
| Mid-size retail area @ 19,502 sq. ft. x $17.00 P.S.F. | $331,534 |
| Bank retail area @ 3,000 sq. ft. x $31.00 P.S.F. | $ 93,000 |
| TOTAL: POTENTIAL GROSS INCOME | $514,094 |
| LESS: Vacancy & Collection Loss @ 7.5% | ($ 38,557) |
| TOTAL: EFFECTIVE GROSS INCOME | $475,537 |

| STABILIZED EXPENSES: | | |
|---|---|---|
| Management/Admin. @ 5% of EGI | $23,777 | |
| Repl. Reserves @ 2% of EGI | $ 9,511 | |
| Leasing commission @ 3.5% of EGI | $16,644 | |
| Tenant Improvement @ $1.00 P.S.F. | $24,502 | |
| TOTAL: STABILIZED EXPENSES | ($74,434) | |

| | |
|---|---|
| NET OPERATING INCOME | $401,103 |
| Capitalization Rate 7.26% | |
| MARKET VALUE: | $5,524,835 |

Therefore, under the income capitalization approach, the court finds the true or fair market value of the subject property is: (i) $6,406,446, as of the October 1, 2019 and October 1, 2020 valuation dates; (ii) $6,225,354, as of the October 1, 2021 valuation date; (iii) $6,021,548, as of the October 1, 2022 valuation date; and (iv) $5,524,835, as of the October 1, 2023 valuation date.

E. Corrected assessment

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the correct tax assessment for the subject property for the 2020, 2021, 2022, 2023, and 2024 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property






by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2020 tax year, the ratio of the total assessed value, $5,217,000 to true market value, $6,406,446, yields a ratio of 81.43% ($5,217,000/$6,406,446 = 81.43%), which squarely falls between Paterson's 2020 upper-level limit (96.40%) and lower-level limit (71.26%) of the Chapter 123 common level range. Consequently, no adjustment to the subject property's 2020 tax year assessment is warranted. Accordingly, a judgment dismissing plaintiff's 2020 tax year complaint will be entered.

For the 2021 tax year, the ratio of the total assessed value, $5,217,000 to true market value, $6,406,446, yields a ratio of 81.43% ($5,217,000/$6,406,446 = 81.43%), which squarely falls between Paterson's 2021 upper-level limit (87.69%) and lower-level limit (64.81%) of the Chapter 123 common level range. Consequently, no adjustment to the subject property's 2021 tax year assessment is warranted. Accordingly, a judgment dismissing plaintiff's 2021 tax year complaint will be entered.

For the 2022 tax year, the ratio of the total assessed value, $5,217,000 to true market value, $6,225,354 yields a ratio of 83.80% ($5,217,000/$6,225,354 = 83.80%), which exceeds Paterson's 2022 upper-level limit (78.18%) of the Chapter 123 common level range. Consequently, an adjustment is warranted to the subject property's 2022 tax year assessment. Therefore, the subject property's 2022 tax year assessment calculation is:

$$\$6,225,354 \times .6798 = \$4,232,000 \text{ [ROUNDED]}$$

Accordingly, a judgment revising the subject property's 2022 tax year assessment will be entered as follows:






| Block 1006, Lot 3 | | Block 1006, Lot 4 | |
|---|---|---|---|
| Land: | $ 920,200 | Land: | $217,000 |
| Improvement: | $3,094,800 | Improvement: | $ 0 |
| Total: | $4,015,000 | Total: | $217,000 |

For the 2023 tax year, the ratio of the total assessed value, $5,217,000 to true market value, $6,021,548, yields a ratio of 86.64% ($5,217,000/$6,021,548= 86.64%), which exceeds Paterson's 2023 upper-level limit (68.25%) of the Chapter 123 common level range. Consequently, an adjustment is warranted to the subject property's 2023 tax year assessment. Therefore, the subject property's 2023 tax year assessment calculation is:

$$\$6,021,548 \times .5935 = \$3,573,800 \text{ [ROUNDED]}$$

Accordingly, a judgment revising the subject property's 2023 tax year assessment will be entered as follows:

| Block 1006, Lot 3 | | Block 1006, Lot 4 | |
|---|---|---|---|
| Land: | $ 920,200 | Land: | $217,000 |
| Improvement: | $2,436,600 | Improvement: | $ 0 |
| Total: | $3,356,800 | Total: | $217,000 |

For the 2024 tax year, the ratio of the total assessed value, $5,217,000 to true market value, $5,524,835, yields a ratio of 94.43% ($5,217,000/$5,524,835 = 94.43%), which exceeds Paterson's 2024 upper-level limit (58.88%) of the Chapter 123 common level range. Consequently, an adjustment is warranted to the subject property's 2024 tax year assessment. Therefore, the subject property's 2024 tax year assessment calculation is:

$$\$5,524,835 \times .5120 = \$2,828,700 \text{ [ROUNDED]}$$

Accordingly, a judgment revising the subject property's 2024 tax year assessment will be entered as follows:






| Block 1006, Lot 3 | | Block 1006, Lot 4 | |
|---|---|---|---|
| Land: | $ 920,200 | Land: | $217,000 |
| Improvement: | $1,691,500 | Improvement: | $ 0 |
| Total: | $2,611,700 | Total: | $217,000 |

Contemporaneously with the issuance of this letter opinion, the court shall enter the above-referenced judgments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.

